SIERRA DUGAN LAW
**Sierra Promise Dugan** (State Bar No. 281272)
420 3rd Street, Suite 250
Oakland, CA 94607
Telephone: (510) 214-2194
Email: sierra@sierraduganlaw.com

Attorney for Rene Aguayo

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | **Case No.:** 4:23-CR-00284-YGR |
| Plaintiff, | |
| v. | **RENE AGUAYO'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE UNDER 18 U.S.C § 3553(A)** |
| **RENE AGUAYO**, | |
| Defendant. | **Court:** Courtroom 1, 4th Floor |
| | **Hearing Date:** June 26, 2025 |
| | **Hearing Time:** 2:00 p.m. |

# I. INTRODUCTION

Rene Aguayo plead guilty to possession with the intent to distribute cocaine in violation of 21 U.S.C. §841(a)(1) and (b)(1)(C).  Mr. Aguayo is humbled by the reality that he faces a United States Sentencing Guidelines range of up to 57 – 71 months[1], and takes full responsibility for his crimes. Defendant Rene Aguayo hereby respectfully requests that the Court ultimately impose a sentence equivalent to time served with no additional incarceration time.

If the Court is not inclined to impose the requested sentence at this time, Mr. Aguayo suggests two alternative paths to achieve this objective; for the Court to defer, for a period of one year or for a period deemed appropriate by the Court, the determination and imposition of his final sentence, so that he can continue to show to the Court, the Government, society, and his family and friends that he is deserving of an ultimate sentence that does not require further incarceration.  Alternatively, Mr. Aguayo suggest that the Court could refer him to the Court's Conviction Alternatives Program ("CAP").

Mr. Aguayo entered into the New Bridge Foundation on November 21, 2024 and completed the program on June 2, 2025.  Mr. Aguayo is proud to report that he excelled at the New Bridge Foundation.  He has transitioned into a sober living environment ("SLE") and is working part time at a local yogurt shop a few blocks from his home.  His immediate goal is the graduate from the New Bridge Foundation.  He believes his proposed sentencing options offers this Court three pathways, each of which is sufficient but not greater than necessary to comply with the policies and purposes set forth in 18 U.S.C. § 3553(a)(2) given the nature and circumstances of his crimes and personal history while accounting for the seriousness of his crime, promoting respect for the law, providing just punishment and deterrence, protecting public safety, and providing Mr. Aguayo with the tools necessary to assist in his rehabilitation.

Mr. Aguayo believes his proposed sentence, including the requested deferral, is well supported by clear and compelling evidence of the rehabilitation that he has achieved to date and his ongoing process and commitment to continuing rehabilitation.  The Court has already invested in Mr.

---

[1] The Presentencing Report ("PSR") reflects a Guideline range of 57 – 71 months and a Criminal History category of I.  PSR, Sentencing Recommendation, p. 1.

**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**
*United States v. Aguayo*, 4:21-CR-00338-YGR

Aguayo's treatment by supporting him through New Bridge Foundation. His crimes were the direct result of his life-long addiction to drugs and alcohol. Mr. Aguayo believes his commitment to rehabilitation and change argues strongly that additional jail or prison time is not necessary to achieve the goals or comply with the sentencing policies of 18 U.S.C. § 3553(a)(2).

The importance and reliability of Mr. Aguayo's recovery to date are recognized by Probation, as the Presentence Investigation Report ("PSR") recommended a significant downward variance from his Sentencing Guideline range. Mr. Aguayo and the community at large would be better served by allowing him to continue on his rehabilitation journey outside of prison whether that be a sentence of time served, or by allowing a deferment, and/or through a CAP referral by this Court.

The request for deferment and/or a referral to CAP does not guarantee any outcome, it merely defers the sentencing for a year, and can provide Mr. Aguayo with intensive supervision and accountability to help him defeat, once and for all, his life-long substance abuse. The request will allow Mr. Aguayo to prove to this Court he has changed.

## II. SUMMARY OF OFFENSE AND GUIDELINE CALCULATIONS

Mr. Aguayo's admitted guilt, through an open plea, to the single count alleged in the indictment, possession with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

The Contra Costa County Sheriff's Office became aware of Mr. Aguayo's involvement in drug sales through a forensic investigation of a cellular device not belonging to Mr. Aguayo. (PSR ¶ 9). The execution of a search warrant of Mr. Aguayo's home revealed cocaine, a loaded semi-automatic weapon, a high-capacity pistol magazine, two suppressors, 30 grams of methamphetamine, used glass pipes and digital scales. (*Id.*). Of note, Mr. Aguayo was not a prohibited from possessing a gun and the glass pipes and methamphetamine were for Mr. Aguayo's personal use.

There is no plea agreement in this case and no agreements regarding applicable offense level or criminal history category. The defense agrees with probation that the base offense level is 26 and that a 2-point special offense characteristic may be applicable due to the presence of a firearm, ammunition

and two suppressors. (PSR ¶ 15, 16).  The defense also agrees with the three-point reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and USSG § 3E1.1(b). (PSR ¶ 22, 23) for a total offense level of 23 or 25 depending on if the Court is inclined to add the 2-point special offense characteristic.  (PSR ¶ 24).

Mr. Aguayo's criminal history category is I and he is a zero-point offender.  (PSR ¶ 27). Unfortunately, he is not entitled to a 2-point reduction as a zero-point offender due to the presence of the firearm at Mr. Aguayo's residence.[2]  With an offense level of 23 and a criminal history category of I, the applicable sentencing range is 46-57 months.  With an offense level of 25 and a criminal history category of I, the applicable sentencing range is 57 – 71 months.  (PSR § 57).

The PSR was thorough and thoughtful in their fact gathering and analysis, rightly recognizing the presence of significant mitigation factors in Mr. Aguayo's favor and recommended a significant variance from it's calculated sentencing range of 57 to 71 months; a recommended sentence of 36 months.  (PSR, Sentencing Rec. p. 2).  Probation specifically sight to the "need to promote public safety" and "provide sufficient deterrent to the defendant's involvement in the instant case" as reasons that favor incarceration.

## II. RENE AGUAYO'S PERSONAL HISTORY SUPPORT HIS PROPOSED SENTENCE

### 1.      A Violent and Traumatic Childhood

Mr. Aguayo was born into violence, having been born early because his alcoholic and violent father, Francisco Aguayo, threw his mother, Rosa Rosales, down a flight of stairs. (PSR ¶ 35).  Mr. Aguayo is the third of five siblings in his family, born on October 12, 1983, in Pittsburg, California. (*Id*.).  His neighborhood was filled with gangs, prostitution and gun and drug sales. (*Id*.) From an early age Mr. Aguayo witnessed violence both in his neighborhood and inside his home.  (*Id*.).  He often inserted himself between his father and mother's physical altercations which resulted in his own punishment.  (*Id*.).  Mr. Aguayo's father often mentally and physically harmed him by locking him in

---

[2] See USSG § 4C1.1.

**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**
*United States v. Aguayo*, 4:21-CR-00338-YGR

3

confined areas for long periods and beating him with objects.  While in the 2nd grade, CPS was called by Mr. Aguayo's school due to the extreme welts on his back left after being beaten with a car serpentine belt by his father. (*Id.*)

When Mr. Aguayo was 8 years old, his father forced his mother to falsify documents in order to get government assistance.  (*Id.*)  This resulted in her incarceration and ultimately his parent's separation. (*Id.*). Mr. Aguayo's family dynamic drastically changed when his parent's separated. (PSR ¶ 36).  His mother was a stay-at-home mother before the separation, afterward, she was forced to work two jobs. (*Id.*).  The absence of his mother had a negative impact on Mr. Aguayo.  He was left to rely on his siblings, primarily his oldest sister Elizabeth Aguayo, and to essentially fend for himself as his father returned to Mexico shortly after the separation. (*Id.*)  The feelings of abandonment led to behavioral issues for Mr. Aguayo in school, which only worsened in his teen years.  He began daily use of alcohol and marijuana daily at age 14. (PSR ¶ 36).  Despite ongoing difficulties in high school, including repeating his senior year, Mr. Aguayo graduated from Mount Diablo High School in 2002. (PSR ¶ 50).  Mr. Aguayo completed the Adverse Childhood Experience Questionnaire ("ACEs") with his attorney and scored a 7 out of 10.

### 2.    Work and Family Life

Despite his traumatic childhood, Mr. Aguayo did not get turn toward the criminality of his neighborhood.  Instead, he maintained a strong work ethic and after graduating from high school, began working as an attendant at a shooting range called United Sportsmen Incorporated in Concord, California until 2005.  (PSR ¶ 51).  It was during this time that Mr. Aguayo began using cocaine. From 2005 until 2012, Mr. Aguayo worked as a painter.  In 2009, he met Katherine Palma and they began to date.  Mr. Aguayo's relationship with Ms. Palma gave him the love and purpose he needed to quit drinking and using drugs.  However, he did not quit for himself but for Ms. Palma.

Mr. Aguayo began working for Paul Davis Restoration in 2012 doing various property restoration projects.  (*Id.*)  His daughter Natalia Aguayo was born in August 2, 2012.  The birth of his daughter was the most important moment of Mr. Aguayo's life.  He loved his daughter more than anything and wanted to give her the best life possible.  To do this, Mr. Aguayo became a "workaholic", desperate provide for his family and allow Ms. Palma to be a stay-at-home mother.

1    (*Id.*)    Beginning in 2014, his relationship with Ms. Palma began to deteriorate due to his extreme

2    work schedule.  In response, Mr. Aguayo began to turn back to alcohol and substances to deal with

3    their problems.  (*Id.*)  In 2015, Mr. Aguayo confirmed Ms. Palma's infidelity and they separated.

4    (*Id.*). Ms. Palma took his daughter.  The end of his family life and relationship eviscerated Mr.

5    Aguayo's sense of self and his sobriety.

6        **3.    Demise of Relationship and Accident**

7        In 2015, Mr. Aguayo was working for Restoration 911 and did not have the tools to deal with

8    his separation and loss of his daughter. (PSR ¶ 51).  Mr. Aguayo was unfamiliar with the family

9    courts and his parental rights so Ms. Palma got full custody of their daughter.  (PSR ¶ 39).  It wasn't

10    until years later that Mr. Aguayo understood that he could have contested the custody order of the

11    Court.  The loss of his partner and his daughter threw Mr. Aguayo into a depression and a more

12    extreme addiction.  The responsibility of family life which tethered him to sobriety was gone.

13    Despite this, Mr. Aguayo dutifully paid child support and was an active and involved father. (*Id.*)  He

14    never used drugs or alcohol with his daughter.  After skipping around at a few different restoration

15    businesses, Mr. Aguayo settled with Coit Services in Burlingame, California as a restoration

16    specialist, working for them from 2017 until his accident in 2021.  (PSR ¶ 51).

17        By 2021, Mr. Aguayo was deep in his addiction.  He was drinking daily, using marijuana and

18    cocaine.  He was still employed but he was starting to lose control. On September 6, 2021 Mr.

19    Aguayo was in a catastrophic accident that involved both alcohol and cocaine. (PSR ¶ 27, 44).  The

20    accident resulted in a traumatic brain injury, being placed in a medically induced a coma for two

21    weeks, a fractured skull, shattered eye sockets, broken ribs, broken fibula, shattered right ankle, knee

22    replacement surgery, severe memory loss, and numbness and nerve damage in his arms and legs.

23    (PSR ¶ 44).

24        The accident not only damaged his body, it damaged his spirit because it was impossible for

25    Mr. Aguayo to earn a living.  Mr. Aguayo's sense of self was intrinsically linked to his ability to

26    work and provide.  When he lost his job at Coit Services and stopped receiving disability benefits in

27    March, 2022, he lost himself.  (*Id.*)  Mr. Aguayo tried to earn money after the accident and even had a

28    Go Fund Me Campaign, but he couldn't earn enough money to live.  (PSR ¶ 52).  Still in a

wheelchair, without the ability to work, Mr. Aguayo was in a desperate situation and turned to drug sales to make ends meet. This is a choice Mr. Aguayo deeply regrets. But, at the time Mr. Aguayo was recovering from a traumatic brain injury and own use of alcohol and narcotics increased. Mr. Aguayo is allergic to most pain medication, including opioids and over the counter pain medication. He was able to justify his extreme substance use as the only means to relieve his pain post-accident. Ultimately, he was drinking to excess and using both cocaine and methamphetamine multiple times per day.

### 4.    Arrest, Pretrial Release, Treatment

Mr. Aguayo was initially arrested on February 22, 2023 by the Contra Costa County Sheriff. (PSR ¶ 9). He was released but indicted on federal charges on August 24, 2024. (PSR ¶ 1). Mr. Aguayo made his first appearance on October 10, 2023 and was remanded into custody. (PSR ¶ 4). The pretrial services bail report noted Mr. Aguayo suffered from "substance abuse history." (See Dkt. No. 9). On November 1, 2023 Mr. Aguayo was released on an unsecured $50,000 bond with his mother as a surety. (*Id.*). Pretrial services submitted a violation memorandum on December 21, 2023 for using marijuana and missing a substance abuse treatment session and Mr. Aguayo was admonished. (PSR ¶ 5).

On February 15, 2024 an initial screening for CAP was conducted on Mr. Aguayo. During that screening, Mr. Aguayo minimized, as most addicts do, his substance abuse, admitting to only using alcohol and marijuana. Mr. Aguayo was not ready to admit he was an alcoholic and a drug addict. He had lived his life trying to convince himself otherwise. On July 12, 2024, pretrial services submitted another violation memorandum regarding his multiple positive tests for marijuana use and Mr. Aguayo was again admonished. (PSR ¶ 6). On November 6, 2024, defense counsel requested Mr. Aguayo be re-assessed for CAP because it became clear that Mr. Aguayo needed help. The request was denied. On November 12, 2024 Pretrial Services submitted another violation memorandum detailing Mr. Aguayo testing positive for cocaine use. (PSR ¶ 7). Mr. Aguayo reluctantly entered the New Bridge Foundation on November 21, 2025 by agreement with pretrial services and the government.

Although initially hesitant, entering into the New Bridge Foundation has been a transformative

experience for Mr. Aguayo.  Mr. Aguayo had never sought drug or mental health treatment.  Once at New Bridge, he was diagnosed with depression and post-traumatic stress disorder.  He embraced treatment by not only attending groups but becoming an active and ultimately a leader in the treatment center community.  (PSR ¶ 40).  He took pride in helping the program run smoothly and even chose to extend his stay in order to deal with issues he did not think he had fully resolve.  (*Id*.)

As the Court is aware, life at New Bridge is strict: there are no cell phones, computers or visitors, and residents cannot leave.  Many residents cannot make it and leave the program after a few days.  Mr. Aguayo's strong work ethic was evident when he chose to work the laundry room rather than passively participate. (PSR § 40).  Ultimately, he became the department head of laundry.  He was then promoted to chief expeditor and later to coordinator.  (*Id*.)  Mr. Aguayo reached the apex of resident jobs, as "top of the house" acting as house support by assisted other resident and made sure the program at New Bridge ran smoothly.  (*Id*.)  In this position he was given keys and a cell phone during the day.  (*Id*.)  He has tested at least once a week since entering New Bridge and now at the SLE.  Mr. Aguayo has never tested positive for any substance.  Mr. Aguayo is committed to recovery and rehabilitation and those closest to him echo these sentiments.

Mr. Aguayo's friends and family can see how treatment has changed him.  Mr. Aguayo's mother, Rosa Rosales was contacted via telephone and expressed support for him to probation. (PSR § 42).  Not only did she corroborate his personal history, but she described her son as "hard working, responsible, a good son and intelligent."  And shared she is hopeful that he would make positive choices moving forward. (*Id*.).  She also provided a letter, which was translated into English, attached as Exhibit A.  In the letter, Ms. Rosales thanks the rehabilitation center for helping her son who she sees as very organized and happy. Exhibit A, Letter of Rosa Rosales.

Mr. Aguayo's oldest sister Elizabeth Aguayo also submitted a letter to the Court, attached as Exhibit B.  Elizabeth was the eldest sibling and was a maternal figure to Mr. Aguayo.  In her letter she writes "I have witnessed Rene's sincere commitment to turning his life around…He is focused, reflective and genuinely determined to grow not just for himself, but for his daughter, our family and the greater community." Exhibit B, Letter of Elizabeth Aguayo-Gonzalez.

Mr. Aguayo's older brother Francisco Aguayo submitted a letter to the Court, attached as

1    Exhibit C.  In his letter he notes that Mr. Aguayo did not want to admit his addiction and that in his

2    recent conversations with Mr. Aguayo he was stuck by his maturity.  Exhibit C, Letter of Francisco

3    Aguayo.  He also notes that the program has helped him "more than I've seen him in our entire

4    lives."

5         Mr. Aguayo's younger brother Emmanuel Aguayo submitted a letter to the Court, attached as

6    Exhibit D.  In his letter, he states that the "rehabilitation program has been great for him and you can

7    see how committed he to turning his life around by completing the steps that have been given to

8    him."  Exhibit D, Letter of Emmanuel Aguayo.

9         Mr. Aguayo's sponsor Carlos Gutierrez also submits a letter, attached as Exhibit E.  He notes

10   Mr. Aguayo changed from shy and reserved person, to "now opening up and is on fire for his

11   recovery.  Exhibit E, Letter of Carlos Gutierrez.  He comments on Mr. Aguayo's commitment not

12   only to himself but to his community by mentoring newer members.  (*Id.*)

13        Mr. Aguayo understands sobriety will be a lifelong job toward healing and self-improvement.

14   He knows he has more work to do and wants to show, not just tell, the Court, his family and friends

15   that he is a changed man.

16   **III. RENE AGUAYO'S REQUEST FOR AN ULTIMATE SENTENCE EQUAL TO CREDIT**
     **FOR TIME SERVED IS APPROPRIATE**

17
          **1.    A Final Sentence of No Further Incarceration or Deferring His Sentencing**
18              **Would More Properly Meet the Goals of the Federal Sentencing System**

19        Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*,

20   337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as

21   an individual and every case as a unique study in the human failings that sometimes mitigate,

22   sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52

23   (2007) (quotations omitted). "Underlying this tradition is the principle that "the punishment should fit

24   the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011)

25   (internal quotations and citations omitted).  The factors detailed in 18 U.S.C. § 355(a) assist the Court

26   in fulfilling this mandate to make "an individualized assessment of a particular defendant's

27   culpability rather than a mechanic application of a given sentence to a given category of crime."

28   *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985).  The sentence recommended in the U.S.

1  Sentencing Guidelines ("U.S.S.G.") is only one factor for district courts to consider in making this

2  judgment and it may not be weighed more heavily than any other § 355(a) factor. *Gall*, 552 U.S. at

3  50; see also *United States v. Carty*, 520 F.3d 984, 991 (9ᵗʰ Cir. 2008)(en banc).

4      As the detailed in the PSR, there is a clear nexus between Mr. Aguayo's life-long substance

5  abuse and his crimes. His addiction caused his accident which then made him turn to illegal drug

6  sales to support himself. Mr. Aguayo's acknowledgment of his substance abuse problem and

7  rehabilitation efforts exhibits compelling evidence that there is no need for him to return to jail or

8  prison in order for his sentence to reflect the seriousness of the offense, promote respect for the law

9  and provide just punishment. As recommended by the probation office, a downward variance is

10  warranted in this case. Mr. Aguayo respectfully requests this Court sentence him to credit for time

11  served and probation or, alternatively defer sentencing for a year or a time period deemed appropriate

12  by this court to allow Mr. Aguayo to continue to showing the Court he is a changed man. As a final

13  alternative, Mr. Aguayo would also welcome a CAP referral if the Court deemed it appropriate.

14      **a. Seriousness of the Offense, Respect for the Law and Just Punishment**

15      The Court has the responsibility to "impose a sentence sufficient, *but not greater than*

16  *necessary*, to accomplish the goals of sentencing, including to reflect the seriousness of the offense,

17  to promote respect for the law, to provide just punishment; to afford adequate deterrence; and to

18  protect the public from further crimes of the defendant." *Kimbrough v. United States*, 552 U.S. 85,

19  101 (2007) (internal quotation marks and citations omitted) (*emphases* added); *see also* 18 U.S.C. §

20  3553(a). The Supreme Court has explained the factors in § 3553(a)(2)(A) – the seriousness of the

21  offense", the need "to promote respect for the law" and "provide just punishment for the offense" –

22  are the sentencing rational of "retribution." See *Tapia v. United States*, 564 U.S. 319, 326 (2011) ("a

23  court may not take account of retribution (the first purpose listed in 3553(a)(2)) when imposing a

24  term of supervised release")(emphasis omitted). "The goal of retribution: is the "interest[] in seeing

25  that the offender is repaid for the hurt he caused." *Kennedy v. Louisiana*, 554 U.S. 407, 442 (2008).

26  Yet, the Supreme Court has warned "a sentence of imprisonment may work to promote not respect,

27  but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without

28  taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54

(quotations omitted).

Mr. Aguayo's felony conviction, coupled with the time he has served in custody in Santa Rita Jail, his six months at New Bridge, continuing with his treatment and the fact he will be supervised by the probation office for the foreseeable future are all harsh consequences for his action. Mr. Aguayo had no arrests until his DUI arrest and accident in 2021 at the age of nearly 38 years old. His arrest on this case represents his only felony case at the age of 39 years old. He has never been to state prison or place on parole. The time Mr. Aguayo has spent in Santa Rita Jail and at New Bridge unable to leave were significant restrictions on his liberty that he had never experienced. A term of probation of at least three years following these restrictions on his liberty is therefore a just punishment.

As the Supreme Court has noted, probation, is not "an act of leniency" but "a substantial restriction of freedom." *Gall*, 552 U.S. at 44. A sentence of probation provides the Court with strong tools to punish Mr. Aguayo if he violates any of the probation conditions. Under 18 U.S.C § 3565(a)(2), when a defendant violates a condition of probation, the Court may either treat the violation like a supervised release revocation, or revoke probation and resentence the defendant anew on the underlying criminal charge, including to a term of imprisonment followed by supervised release. See *United State v. Vasquez*, 160 F. 3d 1237, 1238 (9th Cir. 1998). Requiring Mr. Aguayo to report to the probation office for at least three years, ensures that Mr. Aguayo is not only punished for his actions – with the threat of a potential custodial sentence hanging over his head if he violates any probation conditions – but also intensely supervises him by the Probation Office. Likewise, the proposed deferral of sentencing would likewise administer similar outcomes.

Additionally, the "real conduct and circumstances" in this case must also take into account Mr. Aguayo's trauma, substance abuse and mental health challenges. Trauma during childhood creates higher risk for negative outcomes in life, including health and life opportunities.[3]

---

[3] See Rhitu Chatterjee, "CDC: Childhood Trauma is a Public Health Issue and We Can Do More to Prevent It, "National Public Radio, Nov., 2019, https://www.npr.org/sections/health-shits/2019/11/05/776550377/cdc-childhood-trauma-is-a-public-health-issue-and-we-can-do-more-prevent-it.

Mr. Aguayo has successfully completed over six months of residential treatment at The New Bridge Foundation. While at New Bridge he was diagnosed with depression and PTSD. According to our self-administered ACE's testing, Mr. Aguayo was a 7 out of 10 possible points. He was repeatedly traumatized by his neighborhood and home life yet never received any treatment until he was nearly 40 years old. Instead, he relied on alcohol, marijuana, cocaine, and later methamphetamine to get through his days. He never learned coping skills outside of substance abuse. But these past seven months, since engaging in New Bridge counseling and the recent addition of finding employment and moving into the SLE, have helped him resume the kind of life he thought he would never have again. A life where he has the tools to understanding the underlying cause of his addiction and deal with his trauma. The important people in his life see these changes. While Mr. Aguayo accepts responsibility for the mistakes that he alone caused, any sentence should take this adversity into account.

### b. Deterring Criminal Conduct and Protecting the Public

A custodial sentence is not needed to convince Mr. Aguayo not to commit another crime or to protect the public. The time he has spent in custody and in treatment have already provided the wakeup call Mr. Aguayo needed to turn his life around. Despite the reasons given in the Sentencing Recommendations by Probation, his performance since entering into treatment seven months ago demonstrates he has been deterred, and he has already proven he is not a danger to the community.

### i. Mr. Aguayo's Post-Offense Rehabilitation Demonstrates He Has Been Deterred.

The Court can consider "post-crime maturation and self-rehabilitation: at sentencing. *See United States v. Ruff*, 535 F.3d 999, 1003 (9th Cir. 2008). The Supreme Court has "made clear that post-sentencing or post-offense rehabilitation – particularly in light of its tendency to reveal a defendant's likelihood of future criminal conduct--[is] a *critical factor* to consider in the imposition of sentence." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013)(citing *Pepper v. United States*, 562 U.S. 476, 491-93 (2011) and *Gall*, 552 U.S. at 59 (emphasis added)). Such rehabilitation is "the most up-to-date picture" of a defendant's history and characteristics, which in turn shed light

1  on whether a defendant will be deterred from committing another crime. *Pepper*, 562 U.S. at 492

2  (quoting 18 U.S.C. § 3553(a)(1)).

3       For the first time in his life, Mr. Aguayo received substance abuse and mental health treatment

4  at the New Bridge Foundation. He excelled in treatment and was an active participation in his

5  recovery and at the house. Mr. Aguayo is now able to understand the underlying cause of his

6  addiction and deal with his extensive trauma. He has gained the tools to not fall back into addictive

7  behaviors which were the root cause of his involvement in this case. Likewise, he has gained a new

8  enthusiasm for life. He applied to innumerable jobs and despite rejections, did not give up. Mr.

9  Aguayo was committed to finding work so that he could move into the SLE and the next step in his

10  recovery journey. He recently was hired at Menchie's Yogurt Shop in Berkley, California. The shop

11  is walking distance from his SLE and he is excited to be working again.

12       As noted by his mother, sister, and sponsor they can see a change in his behavior and outlook.

13  His sister's letter makes clear that there is a noticeable change in him since he entered into treatment.

14  Mr. Aguayo's mother echoes this sentiment saying her son is happy again. Additionally, Mr. Aguayo

15  understands the consequences for his actions which in turn ensures he is unlikely to commit another

16  crime.

17       A study published in the *Federal Probation* journal noted empirical evidence corroborates "the

18  importance of defendants' success on pretrial services supervision as a harbinger of improved

19  outcomes in subsequent states of the criminal justice system" including "reduced failures during post-

20  conviction supervision."[4] Mr. Aguayo has demonstrated he can comply with the rules, take

21  advantage of counseling and programming opportunities provided by the Court and get and maintain

22  a job. He should be given the opportunity to continue to do so rather than be incarcerated. Mr.

23  Aguayo's proposed sentence would continue his deterrence.

24  //

25  //

26

27

28  [4] Baber, et al., "A Viable Alternative? Alternatives to Incarceration Across Seven Federal Districts," Federal Probation Vo. 83, no.1, p.8 (June 2019). The full report is available https://www.uscourts.gov/sites/default/files/83 1 2 0.pdf.

**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**
*United States v. Aguayo*, 4:21-CR-00338-YGR

### ii. The Court already determined Mr. Aguayo was not a danger to the public when it affirmed the release order and did not remand him at his plea hearing

As to the danger to the community, when this Court affirmed Mr. Aguayo's release order on November 1, 2023 and did not seek remand after his entry of plea, it necessarily determined he was not a danger to the community.

The Bail Reform Act mandates release of a person pending trial unless the Court finds the person a risk of flight or a danger to the community. 18 U.S.C. § 3142(b). Similarly, following a guilty plea or verdict, a defendant must be remanded into custody unless the Court "finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c)." 18 U.S.C. § 3143(a)(1). However, the PSR notes that Mr. Aguayo is a person whose release is restricted under 18 U.S.C. § 3143, however, continues stating that the "defendant has kept all his court appearances, complied with conditions of pretrial release, and is not viewed as a flight risk or a danger to the community." (PSR, Sentencing Rec. at 2).

In both scenarios, the government bears the burden of proving by clear and convincing evidence that the defendant poses a flight risk or danger to the community that cannot be mitigated through conditions of release. It has failed to do so twice in this case: before Judge Westmore at Mr. Aguayo's detention hearing and when remand was not sought for Mr. Aguayo following his guilty plea. Nothing has happened in the months since those decisions were made that warrants reconsideration. In fact, given his compliance with the release conditions, his participation in treatment and his new employment, and counseling, whatever minimal danger he posed at the time of arrest and initial appearance in federal court is even further reduced. And in probation's own words in the PSR, he is not viewed "a danger to the community". (PSR, Sentencing Rec. at 2).

In summary, Mr. Aguayo's requested sentence for time served or a deferment for one year complies with the intent of federal sentencing. There is also a viable alternative in a CAP referral.

### 2. Mr. Aguayo Referral To CAP Could Also Meet The Goals of Federal Sentencing.

CAP is a "sentencing alternative program[]…designed to serve defendants who pose a higher risk to commit a new crime as a result of distinct personal risk factors, such as youth, early onset

substance abuse or delinquency, prior attempts at treatment or rehabilitation or prior felony convictions."[5] "The Program components and interventions…including intensive supervision and ongoing judicial oversight, are intended to help participants learn from their mistakes, make better choices, and engage in productive behavior."[6]  CAP requires "higher risk and higher needs defendants to participate in a more intensive level of supervision than they would normally be subject to while participating in community supervision," and "required to participate in programs that attempt to address their maladaptive behaviors."[7]

A defendant who completes CAP will receive "consideration by the sentencing judge...for their post-arrest rehabilitation." *Id.*  As the Ninth Circuit explained, a Court can consider "post-crime maturation and self-rehabilitation" at sentencing.  *United States v. Ruff*, 535 F.3d 999, 1003(9th Cir. 2008).  As mentioned previously, post-sentence or post-offense rehabilitation are the best indicators of future criminal conduct and is a "critical factor" to consider during sentencing.  *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013)(citing *Pepper v. United States*, 562 U.S. 476, 491-93 (2011) and *Gall*, 552 U.S. at 59 (emphasis added)).

The premise of CAP is that "there is a reduced likelihood of program participants committing a new crime and the expenditure of fewer public resources as a result of decreased incarceration costs."[8]  Empirical research justifies this premise as detailed previously in a study published in the *Federal Probation* journal. Baber, et al., "A Viable Alternative? Alternatives to Incarceration Across Seven Federal Districts," *Federal Probation* Vol. 83, no. 1, pg. 8 (June 2019).[9] Participation in alternatives to incarceration improves outcomes for those convicted in crimes.

Because Mr. Aguayo would benefit from the "intensive supervision and ongoing judicial oversight" to help him combat his drug addiction and maintain his sobriety, Mr. Aguayo would argue that a CAP referral would be an appropriate sentencing alternative.

---

[5] Northern District of California, Conviction Alternatives Program (CAP) and Leading Emerging Adults to Develop Success (LEADS) Pilot Program, FAQs ("CAP FAQs") available at https://www.cand.uscourts.gov/about/court-programs/cap-frequently-asked-questions/.
[6] CAP FAQs, "How do the CAP and LEADS Programs Work?"
[7] *Id*.
[8] CAP FAQs, "What are the CAP and LEADS programs?
[9] The full report is available https://www.uscourts.gov/sites/default/files/83 1 2 0.pdf.

### a.  Mr. Aguayo's conduct was motivated by drug addiction

Mr. Aguayo meets the requirements of the CAP program.  As a threshold matter, he has not been convicted of a disqualifying offense[10] and is not facing a mandatory minimum prison sentence[11].

Mr. Aguayo has several of the prognostic risk factors considered by Pretrial Services for participation in CAP, including "early onset of delinquency", "early onset of substance of abuse," and "history of criminal arrests and convictions which may be related to other distinct personal factors, such as drug abuse."[12]  As noted earlier, Mr. Aguayo began drinking and smoking marijuana at 14 and using cocaine at 20 years old.  Although he has limited criminal history, his only conviction of reckless driving was directly related to his substance abuse.  Likewise, the case before this court was intrinsically linked to his own substance abuse.

As for the "Criminogenic Need Factors" that "make someone need a program like CAP," the defense would argue that Mr. Aguayo has a severe cocaine and marijuana use disorder, demonstrated by the multiple positive drug tests for marijuana and cocaine since being placed on Pretrial Services supervision.  He also has demonstratable proof of substance abuse well before the start of this case.

Ultimately, the offenses here were caused by Mr. Aguayo's drug addiction, leading to unclear thinking and poor decision making that led to him engaging in drug sales.  Those mistakes resulted in a federal conviction, custody time in Santa Rita, residential drug treatment, and the real possibility that he could potentially go to federal prison for a significant period of time.

The best way to ensure Mr. Aguayo does not commit another crime is to help him maintain his sobriety; and one way to do this is to allow him to participate in CAP, which would be an additional layer of programing on top of the intensive outpatient treatment he has completed and continued participation in treatment at the SLE with the New Bridge Foundation.  He would be under the supervision of a close-knit team, including judges, prosecutors, public defenders, pretrial service

---

[10] CAP FAQs, "3.1, How are people selected to participate in the program? Are there disqualifying offenses or disqualifying factors?"

[11] CAP FAQs, "4.5 Pre-conviction v. Post-Conviction Selection – Evaluation and Placement, What are the possible outcomes of a person with mandatory minimum charges entering a CAP or LEADS post-guilty plea without the approval of an AUSA?"

[12] CAP FAQs, "3.2, How are people selected to participate in the program?, What are the Prognostic Risk Factors which indicate a higher likelihood of recidivism that Pretrial Services considers for participation?"

officers, and the Court's Collaborative Court's coordinator, who will hold Mr. Aguayo accountable and help him maintain his sobriety.  While in CAP, he will be required to attend court sessions every two weeks, participate in substance abuse testing and substance abuse and mental health treatment and meet pre-established goals and milestones to advance in the program.

### b.  Mr. Aguayo is motivated to make a positive, long-term change in his life

Mr. Aguayo is committed to turn his life around.  Despite his earlier denials about the extent of his drug addiction, he has acknowledged he has a problem, entered the New Bridge Foundation, and excelled in that rigorous program.  He found a job and graduated into an SLE while continue to use New Bridge resources.  He has been sober since November 21, 2024.  Mr. Aguayo has found honesty, being honest about his drug use and feeling for the first time in his life.

Ultimately, the greatest deterrence comes from the fact that participation in CAP is a privilege not a right. Should Mr. Aguayo violate the structures of the program and avoid his responsibilities, he would be terminated from CAP and face the possibility of a significant term of imprisonment.  In other words, referring Mr. Aguayo to CAP guarantees him nothing.  It simply defers sentencing for a year, so Mr. Aguayo can receive additional programming and oversight that's likely to aid the Court in making an informed decision.

### c.  Defendants facing high Guideline Range and similar facts have been referred to CAP.

As explained earlier, the criminal activity that brings Mr. Aguayo before the Court was motivated by his drug abuse.  Mr. Aguayo is mindful that the Court must avoid unwarranted sentencing disparities among defendants with similar records convicted of similar conduct.  18 U.S.C. § 3553(a)(6).  But he believes others in similar situations and similar facts have been given the opportunity to a deferment with or without the opportunity to participate in CAP.  Further, referring Mr. Aguayo would not lead to disparity.  His fact pattern appears substantially similar to others referred to CAP.  As of September, 2024 there are 94 defendants in the district with drug charges participating in CAP, the bulk of whom entered CAP over the government's objection.  See Exhibit F.[13]

---

[13] Exhibit C is available at the Northern District's Website at https://cand.uscourts.gov/wp-content/uploads/2024/09/CAND_CAPParticipants.pdf.

**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**
*United States v. Aguayo*, 4:21-CR-00338-YGR

1    Mr. Aguayo asks this Court to give him the same opportunity to demonstrate that something

2 positive came out of being charged in a federal criminal case, access to alternatives to incarceration,

3 including programming through the proposed deferment and/or a CAP referral.

4 **IV. CONCLUSION**

5    In conclusion, Mr. Aguayo requests the Court not sentence him to a period of incarceration, or

6 in the alternative, defer sentencing for a year or an appropriate time period and/ or send him for a

7 CAP assessment.

8    Dated:    June 19, 2025                    Respectfully submitted,

9                                              SIERRA DUGAN LAW

10

11

12                                             *s/ Sierra Promise Dugan*
                                               _____
13                                             Sierra Promise Dugan
                                               Attorney for Rene Aguayo
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3                                           EXHIBIT A

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6-19-25

A quien corresponda la precente:
mi nombre es ROSA Rosales
soy la moma de Rene Aguayo R.
y quiero, Agradecer a los centros
de Reaabilitacion,
por la ayuda, que brindoy yo
Veo a mi. hijo mas dierento
muy organisado mas contento
so cambio a sido totalmento
grande aporte de scr un hijo
siempre muy Trabajador
muy buen padre
y un gron scr humono
estoy muy orgullosa de el.
y muy agradecida con todos los
que le on brindado su apoyo


Atendomento: Su mamá

Rosa Rosales -

<u>Translation of Letter from Rosa Rosales</u>
Dated: 6/19/25

To whom this may concern:

My name is Rosa Rosales, and I want to thank the rehabilitation center for the help you have given me. I see my son directing us. He is very organized and happy. His change has been totally great. He has always been a hard-working son, a very good father, and a happy person. I am very proud of him and very grateful to all those who have given him their support.

Sincerely, Rosa Rosales

1
2
3
4                                    EXHIBIT B
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

 Gmail

**Sierra Dugan <sierra.dugan@gmail.com>**

---

## Fwd: Character Letter for Rene Aguayo
1 message

**Rene Aguayo** <rene.rosales.aguayo@gmail.com>                    Wed, Jun 18, 2025 at 6:41 PM
To: Sierra Dugan <sierra@sierraduganlaw.com>

---------- Forwarded message ---------
From: **Elizabeth Gonzalez** <alexxsophiaa@yahoo.com>
Date: Wed, Jun 18, 2025, 6:36 PM
Subject: Character Letter for Rene Aguayo
To: <rene.rosales.aguayo@gmail.com>

**To Whom It May Concern,**

My name is Elizabeth Gonzalez, and I am writing this letter on behalf of my younger brother, René Aguayo. I would like to share a little about the kind of person René is, and how deeply committed he is to his rehabilitation and becoming a valuable, contributing member of his community.

René is one of the most genuine, warm-hearted people I know. He is a devoted father to his daughter, who often calls him her best friend. Despite us growing up with an absent and abusive father, René made a conscious decision to break that cycle. He is kind, encouraging, and deeply committed to being the kind of father every child deserves. Even with the distance between them, he goes out of his way to stay closely connected to his daughter, offering guidance, love, and support. One of his greatest hopes is to one day live near her again and be a consistent presence in her everyday life.

I've witnessed René's sincere commitment to turning his life around. He has successfully completed the first phase of his rehabilitation journey and continues to take meaningful steps toward long-term stability and healing. He is focused, reflective, and genuinely determined to grow not just for himself, but for his daughter, our family, and the greater community.

René is not defined by his past. He is defined by the strength he shows in facing it, learning from it, and moving forward. He simply needs the opportunity to prove that he is ready and willing to contribute in a positive way. I wholeheartedly believe in him and ask that you consider his ongoing efforts and the man he is today.

Thank you for your time and consideration.


Sincerely,
Elizabeth Gonzalez

1

2

3

4                                        EXHIBIT C

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

 **Gmail**

**Sierra Dugan <sierra.dugan@gmail.com>**

---

## Fwd: Rene
1 message

---

**Rene Aguayo** <rene.rosales.aguayo@gmail.com>    Thu, Jun 19, 2025 at 7:53 PM
To: Sierra Dugan <sierra@sierraduganlaw.com>

---------- Forwarded message ---------
From: **francisco A** <faguayo1981@gmail.com>
Date: Thu, Jun 19, 2025, 7:49 PM
Subject: Rene
To: <rene.rosales.aguayo@gmail.com>

To whom it may concern,
I am Rene Aguayo's older brother and close friend. My brother has dealt with his alcohol issues for years. But never admitted to having a problem. He would deflect and never took me serious when I would bring it up. The fact that he chose to extend his program after completing the 90 days issued to him speaks volumes about the work he is putting in. I seen him last week and he spoke to me about accountability and how one of the staff there got him to self reflect. He told me how he didn't even notice that things he was doing were wrong and it shocked me on how much more mature he was. I myself have been working on holding myself accountable and not shrugging things off . As a man with a family and four children accountability is some thing we try to teach our kids. But just being around any group of adults will show you that it's hard for most people of any age to take accountability and admit error. Incarceration wouldn't be help. But programs like the one he is in has helped him more than I've seen in him in our entire lives. Thank you
Sent from my iPhone

1
2
3
4
5
6                                    EXHIBIT D
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Sierra Dugan <sierra.dugan@gmail.com>

## Fwd: Rene letter
1 message

**Rene Aguayo** <rene.rosales.aguayo@gmail.com>                    Thu, Jun 19, 2025 at 5:48 PM
To: Sierra Dugan <sierra@sierraduganlaw.com>

---------- Forwarded message ---------
From: **Emmanuel Aguayo** <emmanuel20aguayo@gmail.com>
Date: Thu, Jun 19, 2025, 5:41 PM
Subject: Rene letter
To: <Rene.rosales.aguayo@gmail.com>

To whom it may concern,

My name is Emmanuel Aguayo, and I am one of Rene's Aguayo siblings. I would like to share how much of an awesome and committed person he is.

Rene has always been a great father, brother and friend. He always makes others around him feel included and likes teaching people stuff. He showed me how to swim, play video games, sport, fishing and other things. Which I very much appreciate growing up. Every time I visited him at his apartment his daughter and him were always laughing and having a great time. His friends have always said great things about him, and I believe the biggest reason why is because he always goes out of his way to stay connected, which is one of his best qualities.

Rene has had to deal with the rough patch but that's not how he is. This rehabilitation program has been great for him and you can see how committed he is to turning his life around by completing the steps that have been given to him. Another great quality Rene has is when he sets a goal he always achieves them. All he needs is a chance to prove it.

Thank you for your time

Emmanuel Aguayo

1
2
3
4                                    EXHIBIT E
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

From,                                                                Date: 6/19/25

Carlos Gutierrez

5690 Bristol Ct.

Livermore, CA 94551

Contact: 408-931-0140

To whom it may concern,

It brings me great pleasure to speak with full confidence on behalf of Rene. I have
known Rene for about 2 years and have the honor of being his sponsor for some
of that time. I have been bringing meetings into New Bridge for the past 9 months
and was there when Rene first arrived. The strides he has made towards his
recovery have been amazing.  Rene has worked hard to maintain his recovery by
doing step work. He has immersed himself in the program and he is active in
meeting participation.  He has acquired a box of tools that he uses to stay on the
course of recovery.

Besides being active in recovery he has also surrounded himself with positive
people. He lives in a recovery community and participates there to help mentor
newer members.

The growth that I have seen in Rene has been a mazing. He came into the
program a bit shy and reserved and now has opened up and is on fire for his
recovery.

Sincerely,

Carlos Gutierrez

1

2

3

4                                          EXHIBIT F

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Northern District of California**
**Conviction Alternatives Program (CAP) Participants by Offense Category**

Last Updated September 4, 2024

### Oakland CAP

| Offense Type | Total # Per Category | # Supported By USAO | % Supported By USAO | # Graduates To Date | # Graduates Not Supported USAO | % Graduates Not Supported by USAO | # Participants Terminated | % Participants Terminated |
|---|---|---|---|---|---|---|---|---|
| Weapons | 25 | 2 | 8% | 18 | 17 | 94% | 7 | 28% |
| Drugs | 30 | 17 | 57% | 21 | 8 | 38% | 5 | 17% |
| Weapons+Drugs | 3 | 0 | 0% | 3 | 3 | 100% | 0 | 0% |
| Property/Fraud | 12 | 6 | 50% | 9 | 4 | 44% | 0 | 0% |
| Total # Participants | 70 | 25 | 36% | 51 | 32 | 63% | 12 | 17% |

### San Francisco CAP

| Offense Type | Total # Per Category | # Supported By USAO | % Supported By USAO | # Graduates To Date | # Graduates Not Supported By USAO | % Graduates Not Supported by USAO | # Participants Terminated | % Participants Terminated |
|---|---|---|---|---|---|---|---|---|
| Weapons | 24 | 1 | 4% | 11 | 10 | 91% | 8 | 33% |
| Drugs | 41 | 15 | 37% | 31 | 17 | 55% | 8 | 20% |
| Weapons+Drugs | 5 | 1 | 0% | 3 | 2 | 67% | 2 | 40% |
| Property/Fraud | 10 | 3 | 30% | 7 | 4 | 57% | 3 | 30% |
| Total # Participants | 80 | 20 | 25% | 52 | 33 | 63% | 21 | 26% |

### San Jose CAP

| Offense Type | Total # Per Category | # Supported By USAO | % Supported By USAO | # Graduates To Date | # Graduates Not Supported By USAO | % Graduates Not Supported by USAO | # Participants Terminated | % Participants Terminated |
|---|---|---|---|---|---|---|---|---|
| Weapons | 9 | 0 | 0% | 7 | 7 | 100% | 1 | 0% |
| Drugs | 23 | 4 | 17% | 15 | 12 | 80% | 3 | 13% |
| Weapons+Drugs | 3 | 0 | 0% | 3 | 3 | 0% | 0 | 0% |
| Property/Fraud | 4 | 1 | 100% | 3 | 2 | 0% | 0 | 0% |
| Total # Participants | 39 | 5 | 13% | 28 | 24 | 86% | 4 | 10% |

### Eureka CAP

| Offense Type | Total # Per Category | # Supported By USAO | % Supported By USAO | # Graduates To Date | # Graduates Not Supported By USAO | % Graduates Not Supported by USAO | # Participants Terminated | % Participants Terminated |
|---|---|---|---|---|---|---|---|---|
| Weapons | 1 | 0 | 0% | 1 | 1 | 100% | 0 | 0% |
| Total # Participants | 1 | 0 | 0% | 1 | 1 | 100% | 0 | 0% |

### District CAP

| Offense Type | Total # Per Category | # Supported By USAO | % Supported By USAO | # Graduates To Date | # Graduates Not Supported USAO | % Graduates Not Supported by USAO | # Participants Terminated | % Participants Terminated |
|---|---|---|---|---|---|---|---|---|
| Weapons | 59 | 3 | 5% | 37 | 35 | 95% | 16 | 27% |
| Drugs | 94 | 36 | 38% | 67 | 37 | 55% | 16 | 17% |
| Weapons+Drugs | 11 | 1 | 9% | 9 | 8 | 89% | 2 | 18% |
| Property/Fraud | 26 | 10 | 38% | 19 | 10 | 53% | 3 | 12% |
| Total # Participants | 190 | 50 | 26% | 132 | 90 | 68% | 37 | 19% |